**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


UNITED STATES OF AMERICA        :       CRIMINAL NO. 02-587-1
                                      :
                                      :
           v.                          :
                                      :       CIVIL NO. 05-4081
JONATHAN BERBERENA             :


**MEMORANDUM**


**Baylson, J.**                                                    **August 16, 2007**

## I.     Introduction

On October 21, 2002, Jonathan Berberena ("Petitioner") pleaded guilty, pursuant to a written plea agreement, to a five count Information, charging him with conspiracy to distribute and possession with intent to distribute cocaine and cocaine base, and possession with intent to distribute cocaine and cocaine base within one thousand feet of a school. This Court sentenced Berberena on May 1, 2003 to 384 months imprisonment, five years supervised release, a $3,000 fine and $500 special assessment. The Third Circuit affirmed the conviction on April 5, 2004. United States v. Berberena, 93 Fed. Appx. 434 (3d Cir. 2004).

Berberena then filed a pro se motion to vacate the sentence under 28 U.S.C. § 2255, alleging that: (1) his guilty plea was involuntary ("Ground One"); (2) Sandra Gafni, Esq., defense counsel at sentencing, was ineffective for failing to adequately review defendant's juvenile records ("Ground Two"); and (3) William Cannon, Esq., defense counsel at the time of defendant's guilty plea, was ineffective because he labored under a conflict of interest ("Ground

Three"). (Doc. No. 45). The Court denied relief with respect to grounds one and two, but determined that an evidentiary hearing was necessary to explore the conflict of interest issue, and appointed David Howard, Esq., to represent Berberena at the hearing. (Doc. No. 54). The Court held an evidentiary hearing on August 18, 2006, and heard testimony from Mr. Cannon. After the hearing, the Court authorized Petitioner's counsel to retain an expert, David Rudovsky, Esq., to prepare a report on the conflict of interest issue. (Doc. No. 80). The Court conducted additional hearings on March 30, 2007 and April 3, 2007, at which Mr. Rudosvky and Mr. Cannon testified, respectively. The parties completed supplemental briefing on June 29, 2007, and oral argument was held on July 24, 2007. For the reasons set forth below, Petitioner's motion under 28 U.S.C. § 2255 is granted,[1] the sentence imposed by the Court on May 1, 2003 is vacated, and the guilty plea entered on October 21, 2002 is withdrawn.

## II.   **Factual and Procedural History**

On November 18, 2000, Pennsylvania authorities arrested Berberena for the homicide of Jose "Joito" Alequin. To represent him on this charge, Berberena retained William Cannon, an attorney with whom he and his common law wife, Demaris Santiago, had a longstanding professional relationship. Demaris Santiago was the purported leader of an organization controlled by members of the Santiago family ("Santiago Drug Organization" or "SDO") that sold cocaine and cocaine base on the 3000 block of North Lawrence Street in Philadelphia, Pennsylvania, from at least March 1997 forward.

---

[1] Petitioner filed a motion under § 2255 to vacate his sentence, but has not filed a separate motion to withdraw his guilty plea. Because Petitioner alleges that defense counsel's advice to plead guilty was tainted by a conflict of interest, the Court will treat the § 2255 motion as including a motion to withdraw the guilty plea.

On June 26, 2001, while Berberena was awaiting trial on the state homicide charges, a federal grand jury returned an indictment, charging thirty-two members of SDO, including Demaris Santiago, with conspiracy to distribute more than 300 kilograms of cocaine and 100 kilograms of crack, and a number of other federal drug offenses.  The indictment was the result of a three-year joint investigation by the Philadelphia Police Department, U.S. Drug Enforcement Administration ("DEA"), U.S. Attorney's Office, and Philadelphia District Attorney's Office, involving multiple undercover purchases, local arrests, and intensive surveillance.  Berberena was not charged in the initial indictment because at the time, the government had insufficient evidence about his role in SDO.  See N.T. May 1, 2003 at 35-36 ("[I]f the Government had the evidence at the time it would have charged [Berberena].").

One week after the federal indictment was filed, Cannon entered his appearance on behalf of Demaris Santiago.  Assistant US Attorney, Thomas Zaleski, immediately advised Cannon in a letter dated July 12, 2001 that the government had "identified a conflict over" Cannon's concurrent representation of Santiago and Berberena.  Zaleski explained:

> There is evidence that Mr. Berberena was a participant in the same drug distribution conspiracy for which Ms. Santiago has been indicted. . . . Ms. Santiago could have information about Mr. Berberena's criminal activities that could be instrumental in a future prosecution of Mr. Berberena, or in the Commonwealth's current homicide prosecution.  In view of this conflict, the government requests that you withdraw as counsel for Ms. Santiago.

(Lttr. from Zaleski to Cannon, July 12, 2001, Tab 3).  Cannon responded by letter dated July 17, 2001, denying the existence of a conflict and rejecting the government's suggestion that he withdraw as Santiago's counsel.  He also attempted to proffer Santiago under the condition that she "not be questioned about Jonathan Berberena during proffer sessions."  (Lttr. from Cannon to

Zaleski, July 17, 2001, Tab 4).  The government refused to accept anything less than Santiago's

"total and complete" cooperation, and reiterated its belief that Cannon's "continued

representation of Damaris Santiago [was] inappropriate."  (Lttr. from Zaleski to Cannon, Sept. 7,

2001, Tab 5).

_____Berberena's state homicide trial began on September 13, 2001 and resulted in a hung jury.

Before Berberena was scheduled to be retried, Cannon unsuccessfully attempted to broker a deal

with Zaleski on behalf of both Berberena and Santiago, under which: (1) Berberena would plead

guilty to third degree murder and receive a sentence of 7-15 years imprisonment, but would not

be indicted federally; and (2) Santiago would plead guilty to the federal drug charges and proffer

completely and truthfully, but would not be questioned about Berberena.  (Lttr. from Cannon to

Zaleski, Oct. 24, 2001, Tab 6; Lttr. from Cannon to Zaleski, Dec. 5, 2001, Tab 7).

On February 4, 2002, Cannon acceded to the government's request and withdrew from

representing Santiago, and J. Michael Farrell entered his appearance on her behalf.  Several days

later, Berberena signed a plea agreement in the state homicide case, stating that he would plead

guilty to third degree murder and receive a maximum sentence of 14-30 years imprisonment,

which would run concurrently with any sentence imposed in connection with his "pending arrest

for violations of Federal Drugs Laws."  (Memorandum of Agreement, ¶ 11, Tab 8).  Berberena

also agreed to cooperate fully and truthfully with the U.S. Attorney's Office and Philadelphia

Police Department in the investigation and prosecution of any criminal activities of which he had

knowledge.  (Id. ¶ 2).

Shortly after signing the state plea agreement, Berberena attended the first of three proffer

sessions with the federal government.  According to Cannon, the session "didn't go well"

because Berberena was "either unable or unwilling" to identify other persons involved in the

Alequin homicide.  (N.T. Aug. 18, 2006 at 32-34).  During the following months, Cannon urged

Zaleski to charge Berberena federally before he was sentenced by Judge Greenspan in the state

homicide case, so that his state and federal sentences could run concurrently.  Cannon sent

periodic updates to Berberena on his discussions with Zaleksi, and copied Santiago on each of

these letters.  (Lttr. from Cannon to Berberena, Mar. 18, 2002, Tab 10; Lttr. from Cannon to

Berberena, Apr. 17, 2002, Tab 12; Lttr. from Cannon to Berberena, May 17, 2002, Tab 14).

Sometime in May 2002, Cannon met with Santiago in the Federal Detention Center, and "made it

clear to her that she must be honest in explaining [Berberena's role in SDO] to Zaleski and the

case agents. . . ."  (Lttr. from Cannon to Berberena, May 17, 2002, Tab 14).

On August 15, 2002, Berberena signed a federal guilty plea agreement, under which he

waived prosecution by indictment, and agreed to plead guilty to counts 1-5 of an Information.

The government made no representations regarding a recommended sentence or its intent to file a

5K1.1 departure motion in the plea agreement.  See Guilty Plea Agreement, ¶ 3(a), Tab 17 ("At

the time of sentencing, the government will . . . [m]ake whatever sentencing recommendation . . .

the government deems appropriate.").  An Information was filed on September 19, 2002, and

Berberena pleaded guilty on October 21, 2002.

On January 6, 2003, Berberena, acting pro se despite the fact that he was still represented

by Cannon, filed a motion to withdraw his guilty plea, which the Court denied after a hearing on

March 25, 2003.  At the hearing, Berberena also requested new counsel because he was having

trouble communicating with Cannon, particularly about the sentence he could expect to receive

under the federal plea agreement.[2]  The Court granted Berberena's request, and appointed Sandra

Gafni, Esq., to replace Cannon on March 31, 2003.  Berberena was sentenced by the undersigned

on May 1, 2003 to 384 months (32 years) imprisonment.  Demaris Santiago received a

substantial downward departure for her cooperation, and was sentenced on June 6, 2005 by Judge

Schiller to 96 months (8 years) imprisonment.

**III.**   **Legal Standard**

In order to establish that counsel was constitutionally ineffective, a habeas petitioner

generally must demonstrate that his attorney's performance was deficient, and he was prejudiced

by this deficiency.  Strickland v. Washington, 466 U.S. 668 (1984).  Counsel's performance is

deficient only if it "fell below an objective standard of reasonableness."  Id. at 688.  In assessing

counsel's performance, a court begins with the presumption that "counsel's conduct falls within

the wide range of reasonable professional assistance."  Id. at 689.  Even if a petitioner overcomes

this presumption and establishes that counsel's conduct was "professionally unreasonable," the

Sixth Amendment is not violated unless there is a "reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

"reasonable probability" is one that is "sufficient to undermine confidence in the outcome" of the

---

[2] Berberena explained to the Court:

> Well the problem is that this wasn't the time mostly that I was
> expecting as when I was entering this plea agreement.  When I . . .
> came in front of you back in October, I expected a certain amount
> of time.  When I have read my PSI, my PSI came to a time that I
> did not expect, you know. . . . I really don't understand it what I'm
> getting into, and I just – seem like I rushed into this.

(N.T. Mar. 25, 2003 at 5-6).

6

proceeding.  Id.

Prejudice is presumed, however, if Petitioner can establish that "an actual conflict of interest adversely affected his lawyer's performance."  Id. at 692 (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)).  In order to establish an "actual conflict," Petitioner must show two elements: (1) some plausible alternative defense strategy or tactic might have been pursued; and (2) the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.  United States v. Morelli, 169 F.3d 798, 810 (3d Cir. 1999).  "An actual conflict exists only if the proposed alternative strategy (a) could benefit the instant defendant and (b) would violate the attorney's duties to the other client."  Id. at 811.  If Petitioner cannot establish an actual conflict, he may still bring a "conventional ineffective assistance claim under Strickland, but [he] must then show prejudice."  Id. at 810 n.15.[3]

---

[3] In its Supplemental Response to the Petition, the Government cites Mickens v. Taylor, 535 U.S. 162 (2002) as the governing legal standard, and suggests that Mickens established an "adverse effects" test that in some way differs from Morelli.  (United States' Supplemental Response to Petition Under 28 U.S.C. § 2255 6-9).  The Court disagrees.  In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court held that, absent an objection at trial, a defendant claiming ineffective assistance based on a conflict of interest must demonstrate that a conflict actually affected the adequacy of counsel's representation.  Id. at 348-49.  In Mickens, petitioner argued that where the trial judge neglects to inquire into a potential conflict, a defendant only has to show that his lawyer was subject to a conflict of interest, and not that the conflict adversely affected counsel's performance.  Mickens, 535 U.S. at 170-71.  The Court rejected petitioner's argument and held that the Sullivan rule applies even when the trial court failed to inquire into a potential conflict.  Id. at 171-72.
In Morelli, the Third Circuit elaborated on what constitutes an actual conflict.  Morelli, 169 F.3d at 810 ("In order to establish an actual conflict the petitioner must show two elements.").  The Court agrees with Petitioner that the standard set forth in Morelli encompasses Sullivan's "adverse effects" requirement.  Thus, if a defendant meets the two-prong Morelli test, he necessarily has established that the conflict of interest adversely affected counsel's performance as required under Sullivan.  See Mickens, 535 U.S. at 172 n.5 ("We have used 'actual conflict of interest' . . . to mean what was required to be shown in Sullivan. . . . An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."); United States v. Gambino, 864 F.2d 1064, 1070-71 (3d Cir. 1988) ("Clearly, a

**IV.**   **Parties' Contentions**

Petitioner contends that Cannon's dual representation of Berberena and Santiago created a serious conflict of interest that tainted his advice to Berberena to plead guilty.  Although the government's case against Berberena was "far from overwhelming," Cannon never explored the possibility of going to trial because of his continuing loyalty to Santiago.  (Rudovsky Report at 3).  While representing Santiago, Cannon decided that her interests were best served by pleading guilty and cooperating with the government.  Santiago, however, would only cooperate if she was not questioned about Berberena during proffer sessions, a condition the government considered unacceptable.  Allowing Berberena to go to trial would have put Cannon in an impossible position: either Santiago would refuse to testify and lose her downward departure for full cooperation (undermining the legal strategy Cannon developed for Santiago), or Cannon would have to cross-examine a former client.  Because of his conflicting loyalties to Santiago and his desire for her to receive a generous departure for cooperating, Cannon never seriously considered the possibility of Berberena defending the federal charges.

The government concedes that Cannon's concurrent representation of Berberena and Santiago created a conflict of interest, but claims there is no evidence that the conflict adversely affected Cannon's performance.  By the time Berberena signed the federal plea agreement, Cannon had withdrawn from representing Santiago, and she had already pled guilty upon the advice of a different lawyer.  Cannon's defense strategy for Berberena was to negotiate a "global

_____

defendant who establishes that his attorney rejected a plausible defense because it conflicted with the interests of another client establishes not only an actual conflict but the adverse effects of it.").

deal" that would allow him to serve the least possible time on his state and federal charges.  To this effect, Cannon successfully persuaded the Commonwealth to agree to a third degree murder plea in exchange for a 14-30 year sentence that would run concurrently with any federal sentence.  Although Cannon was unable to secure a cooperation plea agreement on the drug charges, by pleading guilty, Berberena was still able to avoid a life sentence and receive a 32 year federal sentence that will run concurrently with his state homicide sentence.  Berberena's claim that Cannon encouraged him to plead guilty in order to benefit Santiago is based solely on conjecture and speculation, not evidence.

**V.      Summary of Testimony**

      **A.      William Cannon, Esq.**[4]

      Cannon testified extensively at the August 18, 2006 and April 3, 2007 hearings about his representation of Berberena and Santiago.  Although Cannon had previously defended Berberena in number of "relatively minor" drug cases and the state homicide case, the federal drug case was the first time he represented Santiago.  (N.T. Aug. 18, 2006 at 9-12, 59).  Shortly after entering his appearance on Santiago's behalf, Cannon offered her cooperation to the government, knowing that if she did not receive a departure motion, she "definitely would be facing life imprisonment."  (Id. at 17, 27).  Cannon sent several letters to Zaleski stating that Santiago would plead guilty and proffer about everything except Berberena, and "in consideration of this," Berberena would plead guilty to third degree murder in state court and not be prosecuted

---

[4] William Cannon, Esq. is a very experienced and well-respected criminal defense attorney.  He has practiced criminal law for thirty-seven years, and in the last ten years alone, has tried approximately one hundred cases in federal and state court, and represented fifty defendants indicted on federal drug offenses.  (N.T. Apr. 3, 2007 at 4-6).

federally.  (Id. at 18-20, 26-27, 28-29).  At this point, Cannon did not believe he was representing Berberena (or that he owed him a duty of loyalty) with respect to the federal drug investigation, as Berberena had not yet been charged.  (Id. at 22-24, 30).  In making these proposals to Zaleski, Cannon only considered himself to be "respecting the wishes of [his] client, Demaris Santiago, that she not be put in the position of implicating her husband."  (Id. at 22, 30).

The government, however, refused to negotiate with Cannon regarding Santiago because it believed that Cannon's concurrent representation of Berberena created a conflict of interest, and that anything less than Santiago's complete cooperation was "unacceptable."  (Id. at 20-21, 60; N.T. Apr. 3, 2007 at 46-47).  In February 2002, Cannon finally began to "accept[] the fact that . . . Berberena was going to be charged federally," and withdrew from representing Santiago because he "could hardly represent Demaris and . . . [Berberena] on Federal charges at the same time. . . ."  (N.T. Aug. 18, 2006 at 30-31).  After Santiago was no longer Cannon's client, he continued to copy her on letters he sent to Berberena because "she was the spouse of Mr. Berberena" and was "anxious to know of [his] situation."  (Id. at 43-44).  Cannon also had several conversations with Santiago at the Federal Detention Center about the case, although he "doubt[s]" he ever went to the FDC with the express purpose of meeting with her.  (Id. at 44; N.T. Apr. 3, 2007 at 15).

Once federal charges seemed imminent, Cannon informed Berberena that he had the right to go to trial, but advised him that it was in his best interest to plead guilty and cooperate.  (N.T. Apr. 3, 2007 at 7-8, 48).  This advice was not affected in any way by Cannon's prior representation of Santiago.  (Id. at 11).  From speaking with Zaleski and the lawyers representing the other defendants charged in the indictment, Cannon believed the federal charges against

10

Berberena "would not be very defensible" because the government would have a "slew of cooperating witnesses to testify against [him]." (Id. at 53). By entering a plea agreement, Berberena could "avoid a trial where all these various co-defendants were poised to testify against him." (N.T. Aug. 18, 2006 at 65). Cannon also believed cooperating "would minimize [Berberena's] overall jail exposure," as he potentially could serve a 12-15 year sentence on the federal charges, which would run concurrently with any state time he received for the homicide. (N.T. Apr. 3, 2007 at 8, 18-19). On the other hand, if Berberena went to trial on the drug charges and was found guilty, he would have faced a life sentence under the guidelines. (Id. at 26; N.T. Aug. 18, 2006 at 40).

Because Cannon felt there was "no opportunity for [Berberena] to prevail" at trial, he did not expend "a lot of energy . . . looking for discovery [or] for ways to defend" the charges. (N.T. Aug. 18, 2006 at 40). When Berberena signed the guilty plea agreement, Cannon had not requested or reviewed any 302's or DEA-6's, and therefore did not know specifically what the cooperating witnesses intended to say about Berberena. (Id. at 42-43, 74; Apr. 3, 2007 at 49). However, Cannon did know that many of the cooperators were Demaris Santiago's brothers and were "all in a position to give testimony against [Berberena] as being someone who functioned at some level within the organization." (N.T. Apr. 3, 2007 at 34; N.T. Aug. 18, 2006 at 41).

Ultimately, Cannon's efforts to obtain a cooperation plea agreement for Berberena were unsuccessful because the government thought Berberena's refusal to admit guilt for the Alequin murder would make him a vulnerable witness in a federal trial. (N.T. Apr. 3, 2007 at 24-25; N.T. Aug. 18, 2006 at 54-55, 67). Before Berberena signed the guilty plea agreement, Cannon never talked to him about what he wanted to do if the government rejected his offer to cooperate, and

he is not certain he ever told Berberena that his likely sentence without cooperation would be 360

months.  (N.T. Aug. 18, 2006 at 55; N.T. Apr. 3, 2007 at 49-50).  Although Cannon was

disappointed with the government's decision not to offer Berberena a 5K1.1 departure, in the end

he "still felt that [Berberena] had made the right decision [by] pleading guilty," because he

received a three point reduction in offense level for acceptance of responsibility and avoided a

possible life sentence.  (N.T. Apr. 3, 2007 at 26, 32).

      **B.**      **David Rudovsky, Esq.**[5]

      With the Court's permission, Petitioner retained David Rudovsky, Esq. to prepare an

expert report on the issues of: (1) whether proceeding to trial on the federal drug charges was a

plausible defense strategy or tactic for Berberena, and (2) whether this alternative defense was

inherently in conflict with or not undertaken due to Cannon's other loyalties or interests.  Mr.

Rudovsky submitted an expert report and testified at the March 30, 2007 hearing in this Court.

      Based on his review of almost 1400 pages of documents, including investigative

materials, indictments, reports, and testimony,  Rudovsky concluded that defending the federal

charges was a "clear and plausible alternative" to pleading guilty, as the case against Berberena

was "far from overwhelming."  (Rudovsky Report at 3, 7).  Berberena was not charged in the

---

[5] During the March 30, 2007 hearing, the Court found that Mr. Rudovsky is an expert in criminal law and criminal procedure, and is well qualified to opine on the conflict of interest issues raised in this case.  (N.T. Mar. 30, 2007 at 8).  Between 1967 and 1971, Mr. Rudovsky worked as a staff attorney for the Defender Association of Philadelphia, where he tried hundreds of criminal cases.  (Id. at 7).  In 1971, Mr. Rudovsky founded Kairys, Rudovsky, Epstein & Messing, a law firm that focuses on civil rights and civil liberties litigation, where he continues to practice today.  (Id.).  In 1983, he returned to the Defender Association and served as First Assistant Defender until 1987.  (Id. at 6-7).  Mr. Rudovsky has also been a Senior Fellow at the University of Pennsylvania Law School since 1987, teaching courses in criminal law, evidence and constitutional criminal procedure.  (Id. at 7-8).

initial indictment because of a "lack of credible evidence of his role in the conspiracy," and the

case the government eventually built against him was based largely on coconspirator statements,

rather than electronic or video surveillance, admissions, audio tapes, or undercover police

purchases. (Id. at 3-4).  In Rudovsky's experience, "this is the type of evidence most easily

defended against in this type of conspiracy charge - witnesses who have everything to gain by

naming Berberena." (Id. at 4).  The coconspirator statements were also very "sketchy in nature"

and provided little more than "the most general information about Berberena." (Id. at 4-5). See

N.T. Mar. 30, 2007 at 27-28 ("It was very generic information. . . . I don't think . . . I saw

specific dates, or times, or places, other than general reference[s]. . . .").  In fact, the only

statement that provided any details about Berberena's involvement in SDO suggested that

Berberena would only "hang out" on the 3000 block of North Lawrence Street and "did not give

any orders." (Rudovsky Report at 6). See N.T. Mar. 30, 2007 at 55-56 (noting that the only 302

with details contained "some material that would actually exonerate [Berberena] and not

implicate him").

Rudovsky further testified that Cannon was not in a position to determine if going to trial

was a plausible alternative because he never reviewed any of the coconspirator statements:

> I don't think a criminal defense lawyer can make that judgment without seeing
> how strong that evidence might be.  [T]hat's a critical part of a defense
> investigation. . . . [T]here's some level of investigation that has to be done before
> you can just say, look, plead guilty, we'll get in as quickly as possible.  Whether
> it's through information that your client provides, or through information the
> Government provides, that's the baseline.  You need something before you can
> make that recommendation.

(N.T. Mar. 30, 2007 at 60, 66).  If Cannon had waited for an indictment, he would have been

entitled to obtain discovery from the government, and Berberena "probably" would have received

13

the same three-point reduction for acceptance of responsibility if he pled guilty after being

indicted.  (Id. at 68-69).  Although Berberena would have faced life imprisonment if convicted at

trial, this was "contingent on a whole lot of factors," and in Rudovsky's opinion, Berberena "did

not have much to lose by . . . challenging the government's evidence."  (Id. at 40; Rudovsky

Report at 6).

   With respect to the second issue (i.e., whether proceeding to trial was inherently in

conflict with or not undertaken due to Cannon's loyalties to Santiago), Rudovsky concluded that

Cannon had an inherent and irreconcilable conflict in his representation of Berberena and

Santiago.  In order for Santiago to receive a downward departure at sentencing, she had to

provide information against Berberena, which she refused to do.  (Rudovsky Report at 2).

However, if Berberena pled guilty, Santiago could cooperate without having to discuss Berberena

during the proffer sessions:

> [T]o the degree that it was in Berberena's best interest to proceed to trial, such a
> course would prevent Santiago from securing the kind of downward departures,
> based on cooperation, that she eventually received at sentencing.  The conflict
> prevented [Cannon] from providing independent legal advice to Berberena. . . .
> Further, had Berberena decided to proceed to trial, Mr. Cannon would have been
> faced with the additional conflict posed by cross-examining a former client.  His
> position was inalterably compromised.

(Rudovsky Report at 2-3 & n.2).  Even after Cannon formally withdrew from representing

Santiago, Rudovsky believes he continued to act with divided loyalties, and worked towards

securing a guilty plea from Berberena in order to "foster Santiago's best interests."  (Id. at 2 n.2).

**VI.**   **Discussion**

**A.**   **Existence of an Actual Conflict under *Morelli***

Under Morelli, the Court first must determine whether going to trial was a plausible alternative that Cannon might have pursued.  Morelli, 169 F.3d at 810.  Petitioner does not have to show that this strategy would necessarily have been successful, only that "it possessed sufficient substance to be a viable alternative."  Id.  The Court credits the opinion testimony of Rudovsky on this issue, and concludes that proceeding to trial was, at the very least, a plausible course of action.[6]  As previously noted, the government's case against Berberena was largely based on "generic" statements made by coconspirators during proffer sessions when they were seeking the best possible plea arrangements in their own cases.  (Rudovsky Report at 3).  In Rudovsky's experience, this type of evidence is more easily defended against than surveillance evidence, confessions, or undercover police testimony - none of which was present in Berberena's case.  (Id. at 4).  Although it is certainly possible that the government could have obtained a conviction against Berberena based on cooperating witness' testimony,[7] proceeding to trial was at least a viable alternative within the meaning of Morelli.

Next, the Court must decide whether this alternative strategy was inherently in conflict with or was not undertaken because of Cannon's continuing loyalties to Santiago.  After carefully

---

[6] The government essentially conceded this point at oral argument.  See N.T. July 13, 2007 at 44 ("[G]oing to trial is always an alternative strategy. . . . [T]here's always a possibility you could beat a case.").

[7] Rudovsky recognized this possibility at several points in his testimony.  See N.T. Mar. 30, 2007 at 18 ("I'm not disputing you couldn't get a conviction on it."); id. at 62 ("I'm not disputing you couldn't get a conviction with one cooperator, if the jury believed that."). However, within "the range of government evidence," statements of self-interested co-defendants are among the most defensible.  (Id.).

examining the record, the Court agrees with Petitioner that Cannon never seriously considered

the possibility of Berberena going to trial because of the adverse consequences this would have

for Santiago.  Although the government asserts this conclusion is entirely speculative, there is

ample evidence in the record to justify a reasonable inference that Cannon's loyalties to Santiago

impacted his advice to Berberena to plead guilty.

From the very beginning of his involvement in the federal case, Cannon linked

Berberena's fate to Santiago's.  In an October 24, 2001 letter to Zaleski, Cannon stated that it

would be in Berberena's "best interest, and that of his wife," if Berberena pled guilty to third

degree murder, and "[w]ith Berberena facing a long prison term the government could agree . . .

not to question [Santiago] about her husband."  (Lttr. from Cannon to Zaleski, Oct. 24, 2001, Tab

6).  In a December 5, 2001 letter, Cannon again suggested that Santiago could plead guilty and

proffer without being questioned about Berberena, and "in consideration of this agreement,"

Berberena would plead guilty to an open charge of third degree murder.  (Lttr. from Cannon to

Zaleski, Dec. 5, 2001, Tab 7).  Cannon explained:

> Certainly up until now the impediment to Demaris Santiago proffering is her
> concern that answering any government questions about her husband might bring
> harm to him.  So long as that possibility exists she will not proffer.  With that
> concern removed, however, she is prepared to proffer truthfully and completely
> and her information about the Dominicans should be of great value to the
> government while at the same time hopefully earning her a Departure Motion.

(Id.).  Cannon's concerns for Santiago and her ability to cooperate without incriminating her

husband clearly shaped the defense strategy that Cannon developed for Berberena in both his

state and federal cases.

Even after Cannon formally withdrew from representing Santiago, he continued to

16

communicate with her and provide legal advice.  See N.T. Aug. 18, 2006 at 44-45, 51-53

(Cannon admitting that after he no longer represented Santiago, he had "at least one" substantive

conversation with her about the importance of being honest with the government so that she

would continue to earn a departure motion).  Although the Court finds that Cannon's testimony

at the August 18, 2006 and April 3, 2007 hearings was credible,[8] we also find that his continued

discussions with Santiago were inferentially in conflict with the undivided loyalty he owed

Berberena.  Berberena was entitled to competent counsel who could independently advise him on

the risks and rewards of going to trial, not counsel who was concurrently working to protect the

divergent interests of a former client and co-defendant.

There is also substantial evidence in the record that Cannon advised Berberena to plead

guilty without fully evaluating the strength of the government's case against him.  Cannon

testified that he did not look for discovery or for ways to defend the charges "because there just

was no opportunity for [Berberena] to prevail in such a case."  (N.T. Aug. 18, 2006 at 40).

However, as Cannon himself recognized, this was a difficult assessment to make without

knowing the identities of the cooperating witnesses and "what liabilities and problems they

suffered under."  (Id. at 72).  Even after Zaleski indicated that Berberena would probably not

receive a cooperation agreement, Cannon never discussed the possibility of going to trial with

him.  (N.T. Apr. 3, 2007 at 49-50).  Although Cannon hoped the government "would come

around for the 5K," Cannon knew by the time of Berberena's second proffer session that "there

was little information that [Berberena] could offer . . . that wasn't already known to the

---

[8] See N.T. July 13, 2007 at 30 (Court stating at oral argument that it "accept[s] Mr. Cannon's testimony as credible").

Government," and that Zaleski did not consider him a valuable witness because he refused to admit guilt for the Alequin homicide.  (Id. at 49; N.T. May 1, 2003 at 14; Lttr. from Cannon to Berberena, May 17, 2002, Tab 14).

Based on the record developed in this Court, the most plausible explanation for Cannon's conduct is that his loyalty to Santiago, and his desire for her to cooperate without implicating Berberena, continued to affect the advice he gave Berberena after he stopped representing Santiago, and even after it became clear that the government was not going to treat Berberena as a cooperator.  As Mr. Howard stated at oral argument:

> [I]t goes against any grain of common sense to suggest that at [the] moment [Cannon stopped representing Santiago], [he] can just switch off that divided loyalty and only represent Mr. Berberena and say you know what?  Despite everything that I said before, despite everything that I advised before about how important it was that Ms. Santiago cooperate and that we figure out a way so that [Berberena] wouldn't be an obstacle to her cooperation, I'm now going to advise [Berberena] to go to trial — to go to trial and force [Sant iago] to make the decision [whether to testify against Berberena].

(N.T. July 13, 2007 at 48-49).

In sum, the Court concludes that Cannon never seriously considered defending the federal charges against Berberena because of his divided loyalties, and thus labored under an actual conflict of interest at the time of Berberena's guilty plea.

### B.    Appropriate Remedy

Although Berberena acknowledged his guilt of the crimes charged in the Information by pleading guilty, Cannon's conflict of interest requires the Court to vacate Berberena's guilty plea rather than simply re-sentence him.  As reviewed above, there is substantial evidence in the record that Cannon's divided loyalties prevented him from independently advising Berberena of

18

the risks and rewards of going to trial, or seriously investigating and evaluating the government's evidence. Cannon's conflict of interest clearly impacted his advice to Berberena about pleading guilty, and therefore Berberena did not have adequate counsel at the time of the guilty plea itself. Accordingly, despite Berberena's acknowledgment of guilt, vacating his guilty plea is the most appropriate remedy. Accord N.T. Mar. 30, 2007 at 45 (Rudovsky testifying that, in his opinion, Berberena's admission of guilt during the plea colloquy did not ameliorate any taint from Cannon's conflict of interest).

**VII.    Conclusion**

For the reasons stated above, the Court will grant Petitioner's motion under 28 U.S.C. § 2255, vacate his sentence, and allow him to withdraw his guilty plea. An appropriate Order follows.

A:\U.S. v. Berberena, 02-587-1, 2255 Memo & Order.wpd

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 02-587-1 |
| | : | |
| | : | |
| v. | : | |
| | : | CIVIL NO. 05-4081 |
| JONATHAN BERBERENA | : | |

<u>**ORDER**</u>

AND NOW, this 16th day of August 2007, for the reasons stated in the foregoing

Memorandum, it is hereby ORDERED that:

1.    Petitioner's Motion to Vacate his Sentence under 28 U.S.C. § 2255 (Doc. No. 45), which the Court will treat as including a motion to withdraw the guilty plea, is GRANTED.  Petitioner's sentence imposed by this Court on May 1, 2003 is vacated, and his guilty plea entered on October 21, 2002 is withdrawn.

2.    David Howard, Esq., whose service as court-appointed counsel for Petitioner has been exemplary and is sincerely appreciated, is appointed pursuant to the Criminal Justice Act to continue as Petitioner's counsel in this case for all purposes.

3.    A telephone conference will be scheduled promptly to discuss a trial date.

4.    The Clerk shall close C.A. No. 05-4081.

BY THE COURT:

**/s/ Michael M. Baylson**
Michael M. Baylson, U.S.D.J.